IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| DEREK TODD BINGHAM, | ] |
| Plaintiff, | ] |
| v. | ] No. 2:20-CV- |
| ROBERT WILKIE, SECRETARY OF VETERANS AFFAIRS, | ] |
| Defendant. | ] |

**COMPLAINT**

Plaintiff Todd Bingham files his federal employment claims for disability discrimination and a refusal to accommodate against the Veterans Affairs Mountain Home Medical Center and the Secretary of Veterans Affairs and avers:

1. The Court is empowered to hear the plaintiff's federal employment discrimination/retaliation claims pursuant to its federal question jurisdiction codified at *28 U.S.C. §1331*.

2. The plaintiff's disability discrimination claims, refusal to accommodate his diabetes disability claims, and discriminatory discharge claims are premised upon the provisions are premised upon the provisions of *Section 501* of the Rehabilitation Act, as amended, at *29 U.S.C. §791*, and its applicable

federal regulations at *29 C.F.R. Part 1614.*

3. Plaintiff Bingham is a white male 48-years-of-age. He resides in Sullivan County, Tennessee. Prior to beginning his employment with the VA in 2016, plaintiff Bingham had nearly 20 years in the health care industry, including certified CNA experience, an associate's degree, and a certification as a cardiac ultrasound technician. His employment at the defendant's Veterans Affairs Mountain Home Medical Center in Washington County, Tennessee lasted from March 16, 2016 through January 20, 2017, when he was discriminatorily terminated because of his disability. The plaintiff is afflicted with the disability of Type 1 diabetes, is as a brittle diabetic, and is insulin dependent. As a result of his diabetes, the plaintiff is susceptible to disabling feet blisters and ulcerations.

4. The Department of Veterans Affairs is a federal executive agency operating under the supervision of Secretary Robert Wilkie. The VA operates hundreds of medical centers and health care facilities for the treatment and care of verterans of the nation's armed forces. The defendant operates a health care institution and domiciliary known as the VA Mountain Home in Washington County, Tennessee. The Agency and the United States of America are being served with process, a copy of the complaint and summons, as required by FRCP No. 4 by mailing copies of the process certified mail, return receipt requested, to the U.S. Attorney's Office for the Eastern District of Tennessee in care of the civil-process

clerk in Knoxville, at 800 Market Street, Suite 211, Knoxville, TN 37902. The plaintiff is also mailing a copy of the process by certified mail, return receipt requested, to Mr. William Barr, Attorney General of the United States, at the U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530-0001. The defendant Department of Veteran Affairs is being served by mailing a copy of the process, certified mail return receipt requested to Mr. Robert Wilkie, Secretary of Veteran Affairs, 810 Vermont Avenue, N.W., Washington, D.C., 20571.

    5. Plaintiff Bingham began working as a probationary Housekeeping Aid WG2 in the Mountain Home Environmental Management Services Department (EMS) on March 16, 2016. His first job assignment involved housekeeping duties in the Hospital's Kitchen on the facility's 3:30 p.m. to 12:00 midnight second shift. The plaintiff's diabetic disability required that he be able to check his blood glucose levels as needed to be certain he was keeping it under control and adjust his insulin medication accordingly. The need to check his blood glucose levels depended upon the amount of stress the plaintiff had been under at various times during the day. The plaintiff initially had no problems caring for his disability symptoms.

    6. The plaintiff's housekeeping job duties involved basic cleaning chores, dusting, wiping down tables and chairs, mopping, sweeping, and removing trash from the container in the VA hospital's kitchen and dining areas. The

3

plaintiff was able to follow a set routine. Since the kitchen was closed the majority of the plaintiff's second shift, the plaintiff was able to monitor his blood glucose levels as needed. The plaintiff normally checked his blood glucose levels at least three time per shift and more frequently if he felt the need because of the physical stress of his activities.

7. The plaintiff performed his work well and applied for a housekeeping position in the VA's Emergency Department for the same 3:30 p.m. to 12:00 midnight shift. He was transferred to the new job in early August 2016. The job responsibilities involved the same type of cleaning operations in the ER's patient rooms, nursing work stations, waiting rooms, and triage areas. Although the work pace was slightly faster than his earlier Kitchen housekeeping work, Mr. Bingham was still able to monitor and adjust his blood glucose levels as needed. Mr. Bingham's work space was limited and his foot integrity was not an issue.

8. Mr. Bingham received his first work evaluation in early September 2016. The evaluation reflected that he was meeting expectations. As Mr. Bingham continued working in the ER Department, he experienced no problems regarding his diabetes or foot integrity.

9. Because his son was playing football during his senior year, Mr. Bingham began applying for EMS day-shift positions so he could attend some of the ball games. After seeing several VA employees with less time than he at the

4

VA being assigned to EMS day shift jobs, Mr. Bingham questioned day shift supervisor Chris Shelton regarding his having applied for those positions. Shelton simply replied that he guessed that the plaintiff didn't get those jobs. Mr. Bingham then sought the assistance of the American Federation of Governmental Employees union, which eventually helped him apply for and secure a day shift position involving housekeeping duties in the VA's same-day surgery department.

10. However, the plaintiff remained working the afternoon shift in the ER Department. The Union advised the plaintiff he needed to wait on the current incumbent to leave the same-day surgery EMS job which he had been promised. On November 1, 2016, the plaintiff arrived at work to find another employee in his position in the ER. After being told that he was being assigned to "bed-washing" on the hospital floors, the plaintiff radioed second shift supervisor Timothy Palmer. The plaintiff asked Palmer why he was being reassigned to "bedwashing." Palmer replied that the assignment was at his "discretion" and was part of the plaintiff's "training" for the new day shift same day surgery department job which had been promised to the plaintiff.

11. The plaintiff complained to supervisor Palmer that the interim bed washing assignment was a "crock" because he had not been trained to perform the work. Palmer directed the plaintiff to radio Daniel Honeycutt, locate him, and work with him. Concerned, the plaintiff telephoned the Union office from the ER

5

and complained. The plaintiff then found Mr. Honeycutt working on a hospital floor and "trained" with him for about four hours.

12. The next day, the plaintiff complained to union representative Cecil Carter that he needed training to safely perform his newly assigned tasks. The VA then assigned Josh Reedy to train the plaintiff. The plaintiff continued to work his usual second shift hours.

13. The interim "bed-washing" assignment involved more walking than the plaintiff's prior positions and more walking than the same-day surgery department day shift housekeeping job which had been promised to him. The pace of the work also prevented the plaintiff from monitoring and adjusting his blood glucose levels as needed and medicating his disability with insulin. Plaintiff Bingham advised trainer Reedy that he did not believe that his diabetic condition would tolerate the significant increase in walking demanded by the interim position.

14 The VA never actually transferred the plaintiff to the same day surgery department day shift position as promised. Instead VA supervisors insisted that the plaintiff continue to work as a Housekeeping aid on the second shift from 3:30 p.m to 12:00 midnight. The assignment involved the plaintiff's having to walking at a fast pace to and from various hospital rooms all over the hospital in order to change bedding, wash down walls and ceilings, and sanitize beds and fixtures immediately after patients were discharged. He had to carry a radio in

order to take multiple assignments as they were called in each afternoon and evening. Most of the VA patient discharges were made between 4:00 p.m. and midnight. The increased work pace prevented the plaintiff from adequately checking his blood glucose levels and adjusting his insulin medication. The plaintiff's feet began to develop diabetic blisters.

15. Plaintiff Bingham consulted Union representative Cecil Carter regarding how best to protect himself physically in light of his more onerous work assignment and his diabatic disability. Mr. Carter recommended that the plaintiff request a "reasonable accommodation."

16. After seeing his personal physician, plaintiff Bingham obtained a medical certification recommending that he be allowed to monitor and correct his blood glucose levels on an "as needed" or PRN basis. With the policy-mandated assistance of the Union, the plaintiff officially submitted his request for accommodation on November 4, 2016.

17. Within days of the plaintiff's officially submitting his request for accommodation, the VA discriminated and retaliated against the plaintiff by issuing him a "written counseling" for "disrespectful conduct" involving his November 1, 2016 reassignment "crock" conversation with supervisor Palmer.

18. Instead of immediately granting the plaintiff his much needed requested accommodation, the VA administrators and managers nit-picked his

request and claimed that they did not understand what was meant by the phraseology "on an as needed basis." Through American Federation of Governmental Employees union representative Cecil Carter, the plaintiff notified the VA Human Resources Department and its Accommodation Committed that he was a "brittle" diabetic and needed immediate accommodations regarding his being permitted to take short breaks, check his blood glucose levels, and administer the required insulin. Otherwise, the plaintiff's feet could ulcerate and have to be amputated.

19. The sense of urgency was discriminatorily ignored by the VA administration. In addition to unreasonably delaying the implementation of the requested accommodation, the VA, its HR department, and its accommodations committee ignored the medical advice and recommendations of the plaintiff's physician and endocrinologist and substituted their own restrictions regarding the timing and frequency of the plaintiff's blood glucose monitoring and insulin administration efforts in a delayed December 11, 2016 accommodation decision. The VA's deliberate and discriminatory delay in granting the plaintiff's request for an accommodation and its imposing untenable and medically dangerous restrictions on his taking breaks to monitor his blood glucose levels and adjust his insulin medication violated the VA's regulatory and statutory obligations to accommodate the plaintiff's disability in a timely fashion, It also came to late. Because he was

8
Case 2:20-cv-00034-DCLC-CRW Document 1 Filed 02/24/20 Page 8 of 16 PageID #: 8

a brittle diabetic who was being refused accommodation, the plaintiff's feet had deteriorated and had become blistered and painful.

20. After his initial November 4, 2016 request for accommodation, the plaintiff offered to show supervisor Palmer his blistered feet or photographs of his blistered feet while he was beseeching Palmer and the VA for accommodation. Palmer replied that he did not want to see the photographs.

21. The VA's discriminatory delay in implementing the plaintiff's request for accommodation in monitoring his blood glucose levels and adjusting his insulin medication on an as-needed basis aggravated the deterioration of plaintiff's blistered feet so that they became pre-ulcerative. By November 28, 2016, the plaintiff was unable to walk and had to be put off work for medical reasons.

22. Although the plaintiff repeatedly contacted his VA supervisors by telephone and in-person to advise them of his physical incapacity and visited the VA to present his supervisors with medical certifications and doctors' notes regarding his inability to work because of his damaged feet, the VA supervisors and administrators ignored him. The plaintiff's supervisors refused to talk by telephone with the plaintiff's podiatrist, Dr. Ryan Chatelain, who had put the plaintiff off work because of his blistered feet. Instead of trying to accommodate the plaintiff's disability, VA supervisor and administrators began to discriminatorily designate the plaintiff as being AWOL

23. Dr. Chatelain finally authorized the plaintiff to return to work on or about December 9, 2016 with new restrictions to protect his blistered and pre-ulcerative feet. The plaintiff had to wear supportive shoes with the toes cut out of his shoes in order to allow air to circulate around his feet. When the plaintiff presented his physician's restriction to supervisor Tim Palmer, Palmer laughed at the plaintiff. Palmer told Mr. Bingham that the VA did not have any work for him to do in "flip flops." Thereafter Supervisor Palmer and the VA continued to discriminatorily classify the plaintiff as being AWOL from his job position.

24. Within days of being ridiculed, the plaintiff submitted a new December 11, 2016 request for the accommodation of being assigned to sedentary job duties until his feet healed. The plaintiff's work history qualified him for sedentary clerical duties. In its continuing pattern and practice of discriminating against the plaintiff, the VA finally insisted upon his being assigned to additional cleaning activities which required him to walk to perform his job duties.

25. During his efforts to keep the VA informed of his medical condition and the medical reasons for his missing work, the plaintiff personally talked with Assistant Chief LuAnne Bays, and second shift supervisor Timothy Palmer regarding the deteriorating condition of his feet and his need for more sedentary work and time for insulin adjustment accommodation. The VA's managing agents repeatedly advised Mr. Bingham that the VA had no work for him

and continued to designate him as being AWOL. During his frequent disability-connected visits to the VA, supervisor Tim Palmer, who was designating the plaintiff as being AWOL on days he brought medical excuses to the VA or was absent pursuant to a physician's certification, did not arrive at the VA until the afternoon shift started. On one day, Palmer admitted that he observed the plaintiff at the VA while working on his accommodation requests and supplying medical certifications. Yet Palmer discriminatorily designated Mr. Bingham as being AWOL because the plaintiff did not personally speak to him.

26. The plaintiff avers that the VA improperly and discriminatorily designated him as being AWOL on multiple occasions from November 28, 2016 through January 14, 2017 even though he was complying with the VA's absence call-in protocols and even though he was repeatedly furnishing the VA with successive medical certifications which explained the blistered and pre-ulcerative condition of his feet and which recommended accommodations in order for the plaintiff to work.

27. The plaintiff repeatedly advised his supervisors and the VA's HR office of his medical condition. They knew his diabetic-related feet blisters were a continuing medical concern. Mr. Bingham e-mailed pdf copies of his medical excuses for the days he was charged with being AWOL to HR Manager Tammy Jenkins. He personally gave some of his physician's notes to his department's day

shift leaders George White and Steve Hux and left telephone messages for them. The plaintiff was never released to work without restrictions. The VA supervisors discrimnatorily refused to comply with the medical restrictions.

28. While the plaintiff was off work because the VA supervisors had insisted they had no job which would accommodate his protective restrictions, the VA also issued a December 15, 2016-letter ordering the plaintiff to return to duty. But the plaintiff could not return to his assigned job duties because of the deteriorated condition of his blistered feet and told his supervisors so. He applied for new accommodations which restricted him to sedentary activities until his feet blisters and pre-ulcerations could heal.

29. On January 17, 2017, the VA assigned the plaintiff to supposedly sedentary work cleaning the VA's ice machines. The "accommodation" involved the plaintiff's using a motorized cart to travel through the tunnels between the campus buildings. However, the cart would not fit into all the VA's elevators. The plaintiff's supervisors did not give the plaintiff keys to all of the elevators which he needed to use and did not tell the plaintiff which elevators would hold the motorized cart or where those elevators were located. The plaintiff still had to walk on his damaged feet to perform much of his cleaning duties.

30. The VA's current claim that the plaintiff simply refused to perform his ice machine cleaning duties is false. The plaintiff was not able to perform the

assigned duties because of the amount of walking on his ulcerated feet which was necessitated by the VA's discriminatorily refusing to properly train the plaintiff regarding which elevators he could use with the motorized cart and which ones he could not. At the time, and unknown to the plaintiff, his VA supervisors were already processing his discharge paperwork and apparently felt no need to properly implement the new accommodation.

31. The VA discriminatorily discharged the plaintiff on January 20, 2017 for "unacceptable attendance" and "conduct." During his discharge meeting, the plaintiff learned that supervisor Palmer had been discriminatorily designating him as AWOL by claiming that he was supposed to be at work at 11:30 a.m. each work day even though Palmer had never assigned the plaintiff to the day-shift same day surgery department cleaning position. Neither Palmer nor any other VA supervisor had ever notified the plaintiff that he was supposed to work anything other than the second shift "bed-washing" job which had severely damaged the plaintiff's feet.

32. The repeated refusals of VA supervisors and managers to discuss and provide accommodations for the plaintiff's diabetes and damaged feet were deliberate and maliciously discriminatory. The repeated refusals constituted an intentional breach of the VA's duty to engage in the interactive accommodation process with Mr. Bingham. The VA's repeatedly classifying Mr. Bingham as

AWOL even though its supervisors knew that the plaintiff was medically unable to work his assigned job duties without accommodation constituted additional malicious bad-faith disability discrimination. The VA's discharging the plaintiff because of alleged unexcused AWOL absences was pretextual and maliciously discriminatory and violated The Rehabilitation Act.

33. Plaintiff Bingham subsequently contacted the VA's EEO counselor and Office of Resolution Management and eventually filed formal EEO charges. The plaintiff initially opted for an administrative hearing of his disability claims. Having fully cooperated in good faith with all initial requirements of the EEOC and, after participating in an unsuccessful mediation, the plaintiff requested that the VA issue a Final Agency Decision. The Agency issued its Final Decision on November 26, 2019. The plaintiff has complied with the pertinent federal statutes and regulations regarding the filing of his federal court complaint and has exhausted his administrative remedies.

34. As a result of the VA's disability discrimination and refusal to timely accommodate the plaintiff's diabetic disability, the plaintiff suffered irreparable damage to his feet. He had to undergo foot surgery in March 2017 in order to relieve the blistering and ease the pressure on the bottoms of his feet and toes. The plaintiff is currently drawing social security disability benefits.

35. The VA's continuing discrimination and refusal to accommodate

14
Case 2:20-cv-00034-DCLC-CRW Document 1 Filed 02/24/20 Page 14 of 16
PageID #: 14

his disability has caused the plaintiff to suffer prolonged physical pain and prolonged mental distress. He had to undergo foot surgery to render his feet usable again. The VA's discrimination and refusal to accommodate his disability has permanently impaired the plaintiff's earning capacity and has permanently diminished his enjoyment of life. The plaintiff is entitled to an award of compensatory damages from the VA for the adverse and deleterious impact which the VA's intentional disability discrimination and refusal to accommodate has had upon him.

WHEREFORE, the plaintiff demands:

1. Judgment against the defendant Secretary of Veterans Affairs (and the Department of Veterans Affairs) for all compensatory damages to which he is entitled.

2. A jury to try the plaintiff's claims.

3. An award of attorney's fees as the prevailing party.

4. Such other relief to which the plaintiff may be entitled.

Respectfully Submitted,

s/ C. R. DeVault, Jr.
CHARLTON R. DEVAULT, JR.
TN BPR #000428
102 Broad Street
Kingsport, TN 37660
(423) 246-3601

ATTORNEY FOR THE PLAINTIFF