# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT GREENEVILLE

| | | |
|---|---|---|
| TODD BINGHAM, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| v. | ] | No. 2:20-CV-34 |
| | ] | |
| DENIS McDONOUGH, SECRETARY | ] | |
| OF VETERANS AFFAIRS, | ] | |
| | ] | |
| Defendant. | ] | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The VA's motion misstates or ignores the facts which support the plaintiff's claims of disability discrimination, hostile work environment, and refusal to promptly respond to Mr. Bingham's repeated verbal and written requests for accommodation.

**Overview.** The VA Secretary's motion is based on a deliberately blurred and inaccurate view of the facts from an altitude of 30,000 feet, A ground level view of the operative facts show that once the diabetic plaintiff's newly-assigned onerous bed-washing and extensive walking activities activated his diabetic foot disease and began to callous and blister his fragile feet in November 2016, his Environmental Management Services Department (EMS) supervisors ignored his repeated requests for immediate accommodation and refused to afford him any relief so that he had to stop working because of damaged feet on November 28, 2016.

Physically unable to perform his assigned onerous bed-washing duties, refused permission to do any work in the open-toed shoes recommended by his physician, and refused immediate re-assignment or interim accommodation to sedentary-type lighter work duties, the

1

plaintiff continued to request disability accommodations from his EMS supervisors and from the VA Local Accommodation Coordinator Tammy Jenkins as he remained off work waiting to be assigned to a sedentary-type job position he could physically perform with his diabetic foot disease. Though the plaintiff's prior EMS housekeeping assignments had not damaged his feet, EMS supervisors discriminatorily refused to re-assign him to either the kitchen or the Emergency Room housekeeping duties which he had been performing satisfactorily The VA's EMS and Human Resources Services (HR) repeatedly   stonewalled the plaintiff's requests for accommodation, refused to engage in any interactive accommodation discussions with him, and began counting the days which the plaintiff missed from work because of his blistered feet against him as AWOLs so they could discharge him rather than accommodate him.

The VA points with false pride to its having issued two Accommodation Determinations for the plaintiff in response to his two written accommodation requests. The two Determinations are clear evidence that the plaintiff has a disability, was protected under the Rehabilitation Act, and could actually be accommodated by the VA. The trouble is that the VA's HR acted in concert with the EMS management's discriminatory AWOL scheme by delaying any action upon the plaintiff's repeated verbal and written requests for immediate accommodation. The VA discriminatorily forced the plaintiff to miss work rather than accommodate him.

When the VA's accommodation Board rendered an inadequate blood sugar monitoring accommodation on December 4, 2016 and the plaintiff objected that it was inadequate to protect his now blistered feet, EMS supervisor Palmer, discriminatorily signed his own approval in the plaintiff's signature box and kept designating the plaintiff's resulting absences as AWOLS. Supervisor Palmer and Accommodation Coordinator Jenkins continued to ignore the plaintiff's please for sedentary work to protect his damaged feet, denied him any type of leave, and kept piling up the AWOLs.  During the entire month of December and early January, the

plaintiff continued to deliver current medical certificates requesting immediate accommodation and excusing his absences because of his diseased and fragile feet to his EMS supervisors and to the Accommodations Coordinator.

In early January 2017, as part of the VA's continuing anti-accommodation discriminatory scheme, the VA's Chief of Facilities Management Services Kevin Milliken reviewed and discussed the plaintiff's contrived AWOL attendance record with EMS supervisor Tim Palmer and EMS Assistant Chief LuAnne Bays, who had told the plaintiff on December 16, 2016 that the EMS had no work for him, and recommended that the plaintiff be discharged because of his numerous AWOLs. Chief Milliken's January 4, 2017 termination recommendation [SJP Ex.#9] omitted any reference to the plaintiff's diabetes disability, tp. his blistered feet, to the plaintiff's numerous December medical excuses which recommended accommodations of light duty and then sedentary work, omitted any reference to the plaintiff's numerous verbal requests to supervisor Palmer, Assistant Chief Bays, and Accommodations Coordinator Jenkins for an interim accommodation, and omitted any reference to the Accommodation Board's December 2016 Determination which had confirmed the plaintiff had a disability and was entitled to accommodations.

Chief Milliken's conferring with Bays and Palmer in early January 2017 right before issuing his written Termination Recommendation is reminiscent of the "Three Wise Monkeys" Japanese pictorial Shinto maxim which depicts two of three monkeys' covering first their ears and then their eyes with their paws. The trouble is that after the VA managers refused to "hear or see" the plaintiff's repeated and medically documented requests for accommodation, they did "speak evil" of him by falsely and discriminatorily accusing him of being AWOL in order to secure his discharge.

The VA's consummation of its anti-accommodation scheme to discharge the

plaintiff violated the Rehabilitation Act, the accommodation provisions of 29 CFR §1614.203, and the VA's official accommodation policies published in the VA Handbook at §5795.1.

**Significant Facts and Commentary**. Plaintiff Bingham has been a brittle diabetic since 2006 and has to check and medicate his blood glucose levels with insulin several times a day on an unpredictable "as needed basis," depending on his levels of physical exertion and mental stress. Pl. Decl. ¶1-2.

Mr. Bingham had been treated for a diabetes-related bone infection in his right foot a year before he began working for the VA but had recovered. He had applied for Social Security Benefits at the time and did not appeal the SSA's initial denial. As the plaintiff began working at his EMS housekeeping duties in VA's Medical Center cafeteria in March 2016, he did not experience any problems with his feet. Pl. Decl. ¶3-4.

In August 2016, the plaintiff sought and was given a housekeeping assignment in the VA's Emergency Department. The ER housekeeping activities were somewhat more intense but the area was limited so the plaintiff could still monitor and adjust his blood glucose levels "as needed" without extensive walking during the work day. Mr. Bingham's performance evaluation by second-shift supervisor Timothy Palmer was "meeting expectations. Pl. Decl. ¶5-9.

In an effort to be able to watch his teenage son play high school football, Mr. Bingham attempted unsuccessfully to secure a transfer to a housekeeping day-shift position. After assistance from the American Federal of Governmental Employees Union, Mr. Bingham interviewed with Facilities Management Chief Milliken and supervisor Palmer and understood he was being transferred to a housekeeping job in the VA's Surgical Suites and adjacent labs. He believed the could perform the housekeeping chores required in the surgical area without adversely affecting his diabetes. Pl. Decl. ¶10-13. Unfortunately, instead of following through with the transfer and the VA initiated a pattern of disability discrimination and refusal to

4

accommodate which aggravated his diabetic foot disease, blistered his feet, and required him to leave his un-accommodated work assignment on November 28, 2016.

On November 1, 2016, Mr. Bingham discovered that he had been replaced in the ER housekeeping position and would be required to work an onerous hospital-wide "bed-washing" assignment. Feeling betrayed, Mr. Bingham did have his "this assignment is a crock" radio conversation with supervisor Palmer on November 1, 2016. Contrary to the import of the events described by the VA supervisor Palmer did not issue his November 10 written reprimand to Mr. Bingham *until after* Mr. Bingham had made repeated verbal requests for accommodation for time to check and medicate his blood glucose levels with insulin, and, after being rebuffed, had filed a written request for accommodation for leave on November 4. In his November 7 VISTA application for sick leave, which Palmer approved on November 9, the plaintiff stated that the reason for his requests was "blisters on feet." Pl. Decl. ¶16-18; SJP Ex. #2.

Mr. Bingham's Declaration describes at ¶25 & 28-31 how the fast-paced demands of the heavy- duty, hospital-wide bed washing duties, including the removal and stacking of bed-linens and towels, and performing room-cleaning activities after each patient had checked out of the hospital kept him walking constantly between floors and rooms and from adequately monitoring and medicating his blood-glucose levels.

Based on prior experience with his diabetes, the plaintiff knew the increased pace of his new bed-washing assignment combined with the extensive walking requirement would damage his feet. When supervisor Palmer kept ignoring his verbal requests for accommodation and per the advice and assistance of the Union, the plaintiff filed a written request for accommodation on November 4, 2016 with the VA's Human Resources Department and Local Accommodations Coordinator Tammy Jenkins. SJP Ex. #5. He attached the required medical certification of Jonesborough Community Clinic's PAC James Montage, which recommend that

he be allowed time to monitor and medicate his blood glucose levels and check the condition of his feet on an "as needed" or PRN basis. Pl. Decl. ¶31-34.

Six days later, on November 10, supervisor Palmer issued the "written counseling" to Mr. Bingham regarding his alleged "disrespectful conduct" during the November 1-radio conversation over his new "bed-washing" assignment. Palmer continued to ignore the plaintiff's repeated verbal requests for accommodation regarding the pace of the new assignment's preventing him from having adequate time to monitor and medicate his blood glucose levels and also refused the plaintiff's request to return him to the ER Department housekeeping job. Pl. Decl. ¶19-23.

To protect his feet as much as possible, the plaintiff put cardboard guards and foam rubber toe separators on each foot in an effort to minimize the damage he was beginning to sustain. Pl. Decl. ¶42. Mr. Bingham asked supervisor Palmer to be trained for the new Surgical Suites 11:30 a.m. to 8:00 p.m. housekeeping job which he had discussed with Chief Milliken and Palmer in early October but Palmer responded that he needed the plaintiff to continue performing the bed-washing job on the second shift. Pl. Decl. ¶41.

As part of the VA's developing pattern of disability discrimination, its HR Specialist/Accommodation Co-ordinator Tammy Jenkins began to impede any formal consideration of the plaintiff's November 4-written request for accommodation by insisting that he had to be able to give specific times at which he would monitor and adjust his blood glucose levels instead of doing so on an "as needed" basis. Mr. Bingham did his best to comply with Ms. Jenkins' unnecessary and discriminatory demands for more medical certificates.

Plaintiff Bingham periodically took cell phone photos of his blistered feet and attempted to show them or his bare blistered feet to supervisor Palmer in support of his numerous entreaties for a reassignment to a less onerous housekeeping job. Palmer physically backed away

and refused to view the cell phone photos or Mr. Bingham's damaged feet. In mid-November, Lead man Reedy did finally look at the photos of the plaintiff's blistered feet, assured the plaintiff he was doing a good job, and then told the plaintiff he would have to perform more cleaning work in the VA's catheterization unit's surgical, holding, and waiting areas when the lady who normally cleaned them was off work. Bereft of any VA interim accommodation for his now painfully acute disability, the plaintiff could not work on his feet after November 28, 2016. Pl. Decl. ¶*43-46.

The plaintiff's Declaration at ¶¶52-63, 75, 84-80, 93-97, and 101-108, describes the repeated efforts which he made to furnish the VA with medical certificates from his Jonesborough Community Care Clinic providers regarding his need for time to check his feet and blood glucose levels and then from Quillen ETSU Physician's podiatrist Dr. Ryan Chatelain which explained that since Mr. Bingham's feet had developed lesions and diabetic foot disease, he needed the accommodation of an assignment to a sedentary position or permission to use open-toed shoes during his housekeeping activities.

The plaintiff's SJP Collective Ex. #5 contains copies of the various medical excuses and certificates which Mr. Bingham plaintiff personally delivered to the VA's HR Accommodate Coordinator Tammy Jenkins or to her secretary, as well as to supervisor Palmer and to the EMS Assistant Chief LuAnne Bays over a period of two months to support his repeated verbal requests for immediate accommodation and then his two written requests for accommodations. The certificates are discussed in more detail hereinafter.

On December 9, 2016, the plaintiff went to the EMS supervisors office in open-toed tennis shoes and gave Dr. Chatelain's accommodation and medical excuse certificates to shift lead George White because supervisor Palmer was in a management meeting. While walking through the hospital with White looking for someone who might know about the plaintiff's

accommodation requests, the plaintiff's damaged feet began hurting him and he visited the VA's emergency room. PA Frank Testerman examined and X-rayed the plaintiff's feet and gave him a two day excuse from work along with the recommendation for a sedentary job position. Pl. Decl. ¶56-60; SJP Ex. #6.

The plaintiff took the VA ER excuse back to the EMS supervisor's office and gave it to supervisor Palmer. Palmer looked at it, looked at Mr. Bingham, laughed at him, and announced that he didn't have any work for the plaintiff to do in "flip flops."[1] Pl. Decl. ¶61-63.

**The VA's disability discrimination is also evidenced by its tardily granting the plaintiff an inadequate initial accommodation Determination on December 12, 2016 after it knew the plaintiff's feet had become blistered and after it had received the plaintiff's early December medical certificates and accommodation requests for a sedentary-type job position.**

When Accommodation Coordinator Jenkins advised the plaintiff on December 12 that the initial Accommodation Determination had been issued, the plaintiff drove to the VA's EMS Department on the morning of December 13, printed out the Determination from the break room computer and saw that it did not address his current blistered feet and diabetic foot disease afflications. The plaintiff personally told supervisor Palmer that he would not agree to the inadequate Determination which had only granted the plaintiff time to monitor and medicate his glucose levels. A visibly irritated Palmer announced that he would sign the Determination, wrote his name in the box where the "Requestor Signature was posed to appear and kept the copy. Palmer also designated the plaintiff as being AWOL for that day. Pl. Decl. ¶¶64-72; Doc. 22-4, PageID#:199.

---

[1] After he was discharged in late January 2017, the plaintiff learned that Palmer had designated him as being AWOL for that day, December 9.

But Palmer and his EMS managers discriminatorily asserted that the plaintiff had accepted the inadequate Accommodation Determination as reflected in ¶1 of Assistant Chief LuAnne Bay's December 15, 2016, "Order to Return to Duty" letter. VA's Doc. 22-5. Ms. Bay's letter deliberately ignores the plaintiff's December 14, 2016 written accommodation request for sedentary-type work which was also requested in Dr. Chatelain's December 5 medical certificate which the plaintiff had presented to the EMS supervisor Palmer on December 9, to Accommodation Coordinator Jenkins, and then to EMS Assistant Chief Bays. SJP Collective Ex. #5 p.#010; Pl. Decl. ¶¶88-89.[2]

The plaintiff hereinafter addresses the more egregious acts of malicious disability discrimination practiced by his EMS supervisors and the VA's HR Office by referring to the VA's party-opponent admissions contained in the ORM's EEO Investigative File and VAdocuments produced during discovery.

**Supervisor Timothy Palmer.** Supervisor Palmer attempts to explain his repeatedly ignoring and rejecting the plaintiff's November-January pleas for sedentary type work to relieve his painful feet at §13 of in his ORM August 17, 2107 Affid. [SJP Ex. #1, Pl. Decl. ¶14.] by shrugging his shoulders and insisting that he didn't know whether or not Mr. Bingham had a disability. That's a remarkably damning statement coming from an EMS supervisor who read and approved the plaintiff's earlier MOUVISTA computer leave request which referenced his "diabetes" and "blisters on feet" [SJP Ex. #2] and who recoiled from viewing cell phone photos of the plaintiff's blistered feet presented to him when the plaintiff was asking for lighter

---

[2] The plaintiff filed his written December 14, 2016 Accommodation Request for sedentary job duties and continued to make periodic verbal requests for sedentary job duties accommodation to his supervisors and to HR specialist Jenkins. All of the requests were ignored and the EMS supervisors designated the plaintiff's absences as AWOLs so they could recommend his termination on January 4, 2017.

work accommodations. Palmer deliberately omitted his earlier discriminatory actions from his ORM Affidavit. Nor did he disclose he repeatedly rejected Mr. Bingham's verbal requests for an immediate accommodation, scoffed at his open-toed shoes request as working in "flip-flops," improperly signed his own name in approval box of the VA's December 11 inadequate Accommodation Determination, Doc. 22-4, PageID#:200, Pl. Decl. ¶16-17.

At his ORM Affid. §18, Palmer gives *false* testimony that he discussed the plaintiff's AWOLs with him and claims that the plaintiff did not dispute them. Pl. Decl. ¶86. When Palmer says at §17 that he sent the AWOLs up the "Chain of Command," it appears form the VA documentation that he did do that. At §19, Palmer testifies that he discussed the plaintiff's AWOLs with EMS Assistant Chief LuAnne Bays and Facilities Management Services Kevin Milliken in early January 2017. That would have been just before Chief Milliken issued his request that the plaintiff be discharged for his Palmer-generated AWOLs on January 4, 2017.

At §22 of his ORM affidavit, Palmer admits he knew that the plaintiff had filed a written request for sedentary work accommodation via an e-mail to Accommodation Coordinator Tammy Jenkins but falsifies the receipt date as being January 11, 2017. Both the plaintiff's testimony and the VA's Written Confirmation of Request For Accommodation [SJP Ex. #7] reflect that Mr. Bingham filed his written request for sedentary-type work accommodations on December 14, 2016.

The evidence shows that Palmer's misrepresentation is part of the larger VA managerial conspiracy to cover-up the EMS's illegally denying the plaintiff's repeated verbal (and written) requests for immediate accommodations for his damaged feet so the VA could keep Mr. Bingham off work while facially asserting that he was simply an AWOL employee and deserved to be discharged.

**Reasonable Accommodation Request Worksheet.** Another facet of the VA's conspiracy to cover-up its flagrant disability discrimination is the Accommodation Work Sheet utilized by the Accommodation Committee on or about January 17, 2017 to tardily grant the plaintiff's written accommodation request for a sedentary work position - thirteen days *after* the EMS management had recommended that the plaintiff be discharged for having accrued numerous AWOLs. VA Doc. 22-6, PageID#:206. The Worksheet reflects the date of January 12, 2017 as the date the VA "received" the plaintiff's December 14, 2016 Request for Accommodation.

At worst, that means that the Accommodation Coordinator deliberately withheld the plaintiff's accommodation request for a month without affording him any interim accommodations so that the EMS could repeatedly designate the plaintiff as being AWOL for the months of December and early January and secure his discharge. At best, the Accommodation Coordinator ran the plaintiff back and forth to his doctors for additional unnecessary information without making sure that the EMS was affording him the required temporary interim accommodations.

The dates on the Work Sheet indicate to the unsuspecting reader looking at it from an altitude of 30,000 feet that the HR's Accommodation Board had acted quickly and efficiently to accommodate the plaintiff's accommodate request on the same day, January 14, 2017, on which the Board received it and that the plaintiff's accommodation request was reasonable and should be granted.

The provisions of *29 CFR §1614.203(d)(3)(i)(H),(O),and (Q) [Reasonable accommodation –(i) Procedures]* and the VA's Accommodation Policy promulgated pursuant to that regulatory authority make it clear that when exigent circumstances exist the VA is required to engage in the interactive accommodation discussion process and is required to immediately

grant the disabled employee an "interim" accommodation, such as light-duty work, while it collects any other information reasonably required to make a permanent accommodation determination. Reassignment to another position is required to be considered by the VA.

Accommodation Coordinator Jenkins January 11, 2017 e-mail to Mr. Bingham, SJP Ex. #8, advises him that the EMS managers were supposed to be "temporarily" accommodating him when he reports to work at the VA. Mr. Bingham's immediate e-mail reply reminds Ms. Jenkins that he had repeatedly given medical work restriction excuses to his EMS supervisors and had talked with Assistant Chief LuAnne Bays about being returned to work based on his physicians' accommodation recommendations but had been repeatedly told that the EMS had no work for him to perform. Pl. Decl. ¶111-113, SJP Ex. #8.

The EMS management and the VA's HR Accommodations Co-ordinator knew that the plaintiff's blistered feet were preventing him from working his regular bed-washing job duties as of November 28, they knew as early as December 9 - and constantly thereafter-that several physicians recommended that the plaintiff be immediately granted sedentary-type work accommodations. The VA decision-makers also knew that under federal law and the VA's accommodation policy they had a duty to afford Mr. Bingham that immediate interim accommodation. **Ms. Jenkins January 11, 2017 e-mail is the first time she or anyone else at the VA mentioned "temporary" accommodations to or for the plaintiff.**

That the VA could have immediately granted the plaintiff immediate "temporary" accommodations is demonstrated by the fact its Accommodation Board concluded that Mr. Bingham was entitled to the accommodation of sedentary work on January 12, 2017 because of his disability. A week after granting the plaintiff the accommodations it should have afforded him during November and December 2016, the VA discharged him.

**Angela Milligan.** Additional evidence of the VA's discriminatory duplicity is the

12

plaintiff's December 14, 2016 conversation with the VA's Occupational Health Representative Angela E. Milligan in her VA office regarding the plaintiff's diabetes and damaged feet and his asking for a sedentary work accommodation. During that December 14 conversation, Ms. Milligan told the plaintiff that she knew his of his accommodation case was on the Accommodation Board. Bingham Decl. ¶73-74. Ms. Milligan is the same VA representative who signed the January 12, 2015 Accommodation Worksheet which erroneously reflects the plaintiff filed his accommodation request the same day which the Accommodation Board considered and granted it.

**Plaintiff's Qualifications For Other Job Assignments.** The plaintiff was qualified for various sedentary-type clerical job activities available at the VA by virtue of his pre-VA training, education, and experience. Paragraphs ** of the plaintiff's Declaration describe the type of medical care and related clerical work the plaintiff had performed in earlier years at Johnson City's Wood Ridge Psychiatric Hospital, at Kingsport's Wellmont Holston Valley Medical Center, at the MSHA Johnson City Medical Center, at Tenovai Health Care, at the Jonesborough Community Care Clinic, as well as his Associates Degree from Northeast State Community College. Nothing in the VA discovery productions indicates that Accommodations Coordinator Jenkens made any effort to consider the plaintiff for available clerical positions at the VA. Pl. Decl. ¶77-83.

**Additional December Discriminatory Events.** Another significant event constituting evidence of the EMS supervisors' deceiving the plaintiff and deliberately refusing to grant him an "interim accommodation" took place on December 15, when Mr. Bingham delivered Dr. Ryan Chatelain's detailed medical recommendations and restrictions for "sedentary work activity" [SJP Collecitve Ex. #5, p.010] to Accommodation Coordinator Jenkin's HR office and to the EMS supervisors office. There he talked with shift leader Steve Hux in person

and then with supervisor Palmer by a conference call. Both Hux and Palmer told the plaintiff they were at the "mercy of HR" and that their "hands were tied." They both insisted that the onerous bed-washing job was the only job available for the plaintiff. Pl. Decl. ¶84-86.

The next day, December 16, 2016, the plaintiff delivered Dr. Chatelain's new medical certificate medical obtained per Ms. Jenkins' e-mailed request to her HR Services Secretary. He also met with EMS Assistant Chief LuAnne Bayes, Steve Hux, and first shift supervisor Chris Shelton and gave them copies of his physician's medical certificates with the work accommodation recommendations and restrictions. After looking over the medical certificates, Assistant Chief Bays announced that the VA didn't have "any work of that kind right now." Pl. Decl. ¶87-89.

Bays also participated in the VA's duplicitous scheme with Palmer, Chief Milliken and the HR Office to designate the plaintiff's disability-related absences as AWOLs so they could procure his discharge, Ms. Bays did not verbally inform Mr. Bingham that she had just issued a written order two days earlier directing him to return to work *even though she stated during her meeting with Mr. Bingham that there was no work for him to return to.*

More VA accommodation-obstruction and obfuscation occurred when the HR staff refused to discuss the plaintiff's diabetic foo disease and necessary work accommodations by telephone with Dr. Chatelain on December 22. Pl. Decl. ¶93-95. Accommodations Co-ordinator Jenkins also told Mr. Bingham by telephone on December 26 that the VA needed "more detail" regarding how long he would need sedentary work accommodations. Pl. Decl. ¶96-98.

Continuing his good faith efforts to obtain an illegally withheld accommodation, Mr. Bingham obtained additional medical certificates regarding accommodation details and a medical excuse to be absent from work through the next Tuesday, January 3, 2017 from Dr. Chatelain on December 28. He delivered the medical documents to Accommodation Co-

ordinator Jenkins' HR office and to his EMS supervisors office. Bingham Decl. ¶101; SJP Collecitve Ex. #5, p.005.

**Termination Recommendation.** Facility Management Chief Milliken's sending his internal memo, SJP Ex. #9, requesting the plaintiff's employment be terminated for his having been designated as AWOL throughout the month of December 2016 despite the multitude of medical certificates and excuses which the plaintiff had delivered to the VA's HR Department and to his EMS supervisors, despite the plaintiff's numerous verbal requests for immediate accommodation which the VA discriminatorily ignored, and despite the plaintiff's December 14 written request for accommodation which the VA was holding in limbo until it could procure the plaintiff's termination consummated the VA's discriminatory scheme. Chief Milliken's Request deliberately omits any reference to the circumstances which showed that the VA had been repeatedly violating his federal duty to afford the plaintiff an interim accommodation.

**January 2017.** Not realizing that he had effectively been terminated, the plaintiff continued to take in medical excuses for his January absences and waited in vain for any word from the VA on his numerous requests for accommodation. He continued to telephone his EMS supervisors asking if they had any sedentary-type job he could perform with his requested accommodations. Bingham Decl. ¶ 102-105; SJP Collective Ex.#5, #012 and #006.

But as late as January 13, 2017, EMS supervisor Palmer insisted to the plaintiff that he had to continue to perform the heavy-duty walking intensive bed-washing job. Bingham Decl. ¶ 114.

The VA's Accommodation Board finally approved the plaintiff's request for sedentary work for six months on January 12, to be implemented on January 15. VA Doc.# 22-6. But Accommodation Coordinator Jenkins waited to tell the plaintiff about the approval until January 17, 2017. The plaintiff suspects that the delay had something to do with Chief Milliken

and the EMS supervisors' having pre-determined to discriminatorily discharge the plaintiff. At any rate, within three days of the plaintiff learning he would be accommodated, he was fired. The operations chain of command prevailed over the Accommodation Board's Determination.

The plaintiff went to the EMS break room and printed off his accommodation documents, signed where necessary, and took the copies to Ms. Jenkins and to his supervisors. The EMS supervisors knew that the interim light-duty assignments of paper stapling in Ms. Bay's office and cleaning hospital ice machines were "shams" since Mr. Bingham's discharge paperwork was on the HR Director's desk and Supervisor Palmer did not bother to train the plaintiff, show him where the ice machines were, or show him which elevators which were large enough for the electric cart he was supposed. The plaintiff had to park the cart and engage in extensive walking again. According to Assistant Chief Bays' ORM Affidavit, the EMS supervisors began issuing various critical Reports of Contact regarding his ice machine cleaning performance. Pl. Decl. ¶116-120.

**Chief Kevin Milliken.** During the plaintiff's discharge conference with Facilities Management Services Chief Milliken on January 20, 2017. Chief Milliken's gave Mr. Bingham written notice the plaintiff's unacceptable conduct (related to the November 1 "crock" radio conversation) AND "unacceptable attendance" were the reasons for the discharge. But Chief Milliken testified under penalty of perjury in his ORM Affidavit, SJP Ex. #15, on page 4 ¶19.d. page ** that the plaintiff's AWOLs were **the** reason the VA discharged him.

Chief Milliken's August 23, 2017 ORM Affidavit makes it clear at p. 3, ¶15, that he learned in November/December 2016 from Assistant Chief Bays the plaintiff had a disability and had filed two written requests for accommodation **before** Milliken recommended that he be discharged for having 21 alleged AWOLs. But like his earlier request for termination, Milliken's ORM Affidavit testimony does not address the plaintiff's numerous verbal requests for interim

16

accommodations which were made to his supervisors and to the Accommodations Coordinator and which his physicians made in the various medical certificates the plaintiff gave to the VA supervisors during December and January. Milliken's ORM Affidavit testimony reconfirms the VA's "hear no evil, see no evil" of the facts viewed from 30,000 feet.

At ¶16 on p. 3 of his self-serving ORM Affidavit, Millken gives the false impression that Mr. Bingham stayed absent from the VA campus and failed to contact his supervisors or the HR Department from November 28 through January 3, 2017. Disregarding the federal regulations and the VA's accommodation policy, Milliken discriminatorily blamed the plaintiff for the delays in the VA's accommodating him.

Milliken's ORM Affidavit testimony, like his January 4, 2017 termination recommendation, deliberately ignored: 1) the plaintiff's Declaration description of his many visits and telephone calls to the EMS supervisors office, 2) the dated medical certificates which the plaintiff gave his supervisors and HR Accommodations Coordinator Tammy Jenkins during November, December, and January, 3) the plaintiff's numerous EMS break-room computer leave request entries which were granted or rejected by supervisor Palmer, and (4) Palmer's various Reports of Contact which describe the plaintiff's being present at or near the EMS office during November, December, and January which confirm that Mr. Bingham was in frequent contact with VA supervisors and staff during November and December 2016 and January 2017, while he verbally and in writing requested sedentary work accommodations. Pl. Decl. ¶130-135*.

Plaintiff Bingham underwent foot surgery in March 2017. He was granted social security disability benefits effective as of January 21, 2017, the day after his discriminatory discharge. Bingham Decl. ¶.

**Additional Evidence of Disability Discrimination.** The ORM Affidavit of EMS Assistant Chief LuAnne Bays which the VA has introduced as its double-hearsay summary

judgment exhibit #12, Doc. 22-12 is another VA document rife with deliberate misrepresentations which are intended to make Mr. Bingham appear to be an irredeemable rogue employee. The AWOL attendance record which Ms. Bays itemizes in ¶24, Doc. 22-12, PageID:#257, from December 11, 2016 to January 15, 2017, fails to reflect the content of the various medical excuse certificates and light-duty and sedentary job assignment requests which the plaintiff presented to supervisors and to the Accommodations Coordinator which covered many of the days he was listed AWOL.

Ms. Bays' Affidavit deliberately fails to mention the plaintiff's repeated verbal requests for sedentary work to accommodate his blistered feet, fails to mention her in-person conference with the plaintiff on December 16, 2016 during which she told the plaintiff that the VA had no work "like that" for him, fails to mention the VA's holding the plaintiff's December 14, 2016 written request for accommodation "in limbo," while its EMS supervisors designated his absences as AWOLs, and then lists AWOLs discriminatorily assigned to the plaintiff *after* Chief Milliken recommended in writing that the plaintiff be terminated for the AWOLs which allegedly had accrued through January 4, 2017.

Significantly, Ms. Bay's ORM Affidavit falsely claims in ¶27 on page 7, Doc. 22-12, Page ID:#158 that the VA did not need to engage in interactive accommodation discussions with the plaintiff because it granted his written accommodation request. Left unsaid is the fact that the sedentary job accommodation was granted only after Chief Milliken had initiated the plaintiff's discharge process.

Ms. Bay's affidavit also falsely claims in ¶19 on PageID:#254 of Doc. 22-9, that an unidentified supervisor had an August 18, 2016 counseling session with plaintiff Bingham regarding his AWOLs and that a Low Leave Letter Counseling had been issued to the plaintiff by EMS Chief Milliken on March 19, 2017. The plaintiff was long since discharged by March

19, 2017. There was no August 2016 counseling over any AWOLs because the plaintiff had not yet developed problems with his feet and had not begun accruing AWOLs during the summer of 2016.

Chief Bays' falsely asserts at ¶19.c. and ¶24.c. of her ORM Affidavit, Doc. 22-12, that Palmer discussed accommodations with the plaintiff and granted him interim accommodations in the EMS before the Accommodation Determination was issued. To the contrary, Palmer simply ignored Mr. Bingham's accommodation requests, told him that was no work to be done in "flip-flops" and then that his "hands were tied by HR."

Contrary to Ms. Bays' affidavit testimony and Chief Milliken's assertions, a comparasion of the plaintiff's excused absences set out in SJP Collective Ex.#5 with Ms. Bays' Affid. §24 AWOL summary reveals that Mr. Bingham had only three "unexcused" absences through January 4, the date upon which Chief Milliken requested his termination and had been present at the EMS office applying for leave for those three days, December 15, 16, and 20, 2016 which was denied by supervisor Palmer. Pl. Decl. ¶134-35.

**The actual facts in this case show that truth became an inconvenient nuisance to the EMS VA managers and HR staff who were intent upon refusing to accommodate the plaintiff and upon ignoring his medical certificates so they could discriminatoirly designate him being AWOL and then discharge him.**

**Palmer's Reports of Contact.** The VA has also filed a few of supervisor Palmer's Reports of Contact on the plaintiff as its summary judgment exhibit #9, Doc. 22-9 which describe several episodes of Palmer's discriminatorily designating the plaintiff as being AWOL despite having knowledge of the medical certificates which excused the plaintiff from performing the heavy-duty walking intensive bed-washing duties which had blistered his feet. Palmer's 12/21/2016 Report of Contact, VA Doc. 22-9, PageID#:225, acknowledges that Mr. Bingham

19

had just given him a medical certificate which excused him from work until December 26, 2016. The Report of Contact is evidence of Palmer's discriminatory irritation with the plaintiff because it admits that Palmer designated Mr. Bingham as being AWOL for that day, December 21.[3]

Palmer's 12/22/2016 Report of Contact [Page ID:#227] admits that on December 20, Mr. Bingham had brought by a medical excuse for December 20-23 but that Palmer denied Mr. Bingham's request for any type of leave because he didn't have "much left" and designated him as being AWOL for three days.

Assistant Chief Bays then included Palmer's December 20-21 discriminatory leave denials and the consequent AWOLs in her ORM Affidavit's ¶24, Doc. 22-12 misleading attendance summary. The plaintiff presented medical excuses that covered all but thee of the relevant alleged AWOLs. Mr. Bingham also requested whatever leave he had available as he waited in vain for the VA to accommodate his numerous requests for sedentary work.

**Medical Certificates.** The plaintiff's SJP Collective Ex. #5 presents all of the pertinent medical certificates which excuse the plaintiff from work on many of the days the VA designated him as being AWOL and which set out requests for accommodation for the plaintiff's disability:

> 1) The Jonesborough Community Care Clinic's November 22, 2016 medical certificate recommended that the plaintiff be **allowed time to check and medicate his blood sugar levels and feet for skin damage** [Bingham #003]. [Emphasis supplied].

> 2) The Jonesborough Community Care Clinic's November 28, 2016 medical certificate [Bingham #003] explains that the plaintiff's blood sugar levels depend upon his stress and that **he needed to time check his sugar levels and feet.** [Emphasis Supplied]

> 3) The Jonesborough Community Care December 5, 2016 medical note asks the

---

[3] Assistant Chief Bays counted the plaintiff's excused absences of December 20-23 as AWOLs in her ¶24 of ORM Affidavit itemization at Doc. 22-12, Page ID#:257.

VA representatives to call the Clinic providers to discuss the plaintiff's work options and restrictions and excuses the plaintiff from work on December 5 and 6, 2015 [Bingham #002].

4) Dr. Ryan Chatelain's Quillen ETSU Physicians report letter dated December 2, 2016, gives the VA a history of the plaintiff's diabetic disability, describes the bruised condition of his feet, and recommends the use of modified shoe gear (open toed shoes). Bingham #007-8

5) The Jonesborough Community Care Clinic certificate of November 28, 2016 excuses the plaintiff from working until November 30, 2016 and its December 5, 2016 medical certificate excused the plaintiff from work from December 5 until December 8, 2016. Bingham #001.

6) The Jonesborough Community Care December 6, 2016 certificate [Bingham #001] faxed to HR specialist Tammy Jenkins advised the VA's HR that Mr. Bingham needed time during to check his blood sugar levels and his feet at least 6x per day, and needed to take his weight off of his feet for 5-10 minutes every two hours.

7) **Dr. Chatelain's December 15, 2016 certificate [Bingham #010] advised the VA that the plaintiff had developed pre-ulcerative lesions and needed to wear shoes with cut-out toes. Because the plaintiff's current work activities were causing lesions (blisters) to form every two hours at work, the certificate stated that Mr. Bingham needed a more sedentary position which would limit the "formation of wounds" in his feet.** [Emphasis supplied]

8) Dr. Chatelain's December 21, 2016 certificate [Bingham #011] excuses the plaintiff from working from December 21 through December 25.

9) Dr. Chatelain's December 28, 2016 certificate [Bingham #005] excuses the plaintiff from work through January 4, 2017 because of his damaged feet and states that Mr. Bingham will need accommodations when he returns to work.

10) Dr. Chatelain's January 4, 2017 certificate excused the plaintiff from work from January 4, 2017 until January 9, 2017. A two paragraph typed supplement provided Dr. Chatelain's office to HR specialist Jenkins later in the afternoon of January 4 explains again the plaintiff's medical need for a sedentary job accommodation for his diabetic foot disease. Bingham #012 and 006.

A comparison of the medical certificates which excused the plaintiff from his heavy-duty bed-washing duties on specific days with the AWOL dates listed by Assistant Chief Bays in her Declaration's in ¶24 of Doc. 22-12 shows that she and Palmer charged the plaintiff with being AWOL on the "excused dates" of December 21, 22, 23, and 30, and on the "excused

dates" of January 3, 4, 5, and 6, 2017.[4]   In his 12/22/2016 Report of Contact, Doc. 22-9, PageID:#227 At most then, the plaintiff had three accrued three AWOLs which not covered by medical excuses from December 11 through January 9, 2017, **six days after** Chief Milliken recommended he be discharged for accumulating numerous AWOLs.

       **The Legal Argument.**   There is no issue in this case that the plaintiff had a disability (diabetes and related diabetic foot disease) aggravated by extensive walking and onerous work activities.  There is no issue that the VA could have immediately accommodated the plaintiff's verbal requests and then written requests for accommodation because the Accommodation Board decided in January 2016  could accommodate the plaintiff and because Accommodation Coordinator Jenkins notified the plaintiff in her January 11, 2017 e-mail [SJP Ex. #8] that the EMS supervisors were supposed to be temporarily accommodating him.  Three days after the plaintiff was given notice that sedentary work accommodations had been granted, he was discharged.

       The VA stubbornly insists from the altitude of 30,000 feet that it accommodated the plaintiff and complied with all of its federal disability accommodation obligations outlined in *29 CFR §1614.203, Rehabilitation Act*, and discussed in *School Board of Nassau County v. Arline, 480 U.S. 273 (1987).*   But the actual facts "on the ground" show   the VA

---

[4] The plaintiff's computer time records filed by the VA as its Doc. 22-11 reflect several "no calls-no show" entries by supervisor Palmer from December 1, 2016 forward.  But Palmer was the second-shift supervisor, not the day shift supervisor and the records show that the plaintiff performed his onerous bed-washing duties on the evening 3:30 p.m. to midnight shift. Doc. 22-11, PageID#:234 until his blistered feet made it impossible for him to work.  Supervisor Palmer cleverly and discriminatorily "moved" the plaintiff to a 11:30 a.m. to 8:00 p.m. shift "on paper" without telling him.  When the plaintiff delivered a medical excuse for his impending absences to either the two day shifts supervisors before 3:00 p.m. or to Palmer later in the afternoon, it was Palmer, the evening shift supervisor, and not the day shift supervisors, who designated the plaintiff as "no call, no show" and/or AWOL.  Day shift supervisor, Chris Shelton was aware of the plaintiff's medical excuses and requests for accommodation and did not attempt to penalize him as Palmer did. Doc. 22-11, PageId#:235.

managers/supervisors deliberately frustrated and refused to engage in the interactive accommodation process, and discriminatorily denied Mr. Bingham an immediate interim accommodation which would have kept him working on a VA job which did not damage his feet. To secure Chief Milliken's January 4, 2017 termination recommendation, VA managers delayed the Accommodation Committee's sedentary-type job activities Accommodation Determination until after the plaintiff's disability-related December and January absences had been designated as AWOLs and the plaintiff's termination was in progress.

        The standards for determining whether the VA has violated §501 of the Rehabilitation Act are the same as those applicable to the ADA. *29 CFR §1614.203*(b). The requirements of *29 CFR §1614.203(d)(3)(M)* and *(O)* require the VA to have promulagated procedures for the "expedited processing of requests for reasonable accommodations that are needed sooner than . . . ." the VA's Accommodation Determination policy 30-day time frame.

        The VA's written accommodation policies in its VA Handbook mirror and expand upon the CFR's directives. The Handbook §5975.1, at #7, p. 20, *REQUESTING REASONABLE ACCOMMODATION,* [SJP Ex. #10] recognizes that a VA employee can make his/her accommodation request verbally or in writing and does not have to actually use the word "accommodation." The request can be made to any supervisor who is then supposed to forward it to the appropriate VA officer, usually in the Human Resources Office, and discuss the accommodation with the requesting employee. But as described in the plaintiff's Declaration, his EMS supervisor repeatedly ignored his numerous verbal requests.

        VA Handbook §5975.1, #6. *TIME FRAMES* [SJP Ex. #11] requires that all requests for accommodation "should be processed as expeditiously as possible." *Subsection d* states that an "interim accommodation" should be provided when feasible until the final accommodation can be provided. If the disability is obvious and an interim accommodation is

23

not feasible the local Accommodations Coordinator is to contact accommodation officers at the VA's regional level. In Mr. Bingham's case, an interim was "available" but was only furnished to him as he was being "ushered out the door."

The provisions of the VA Handbook, §5975.1, page 21, #9, INTERACTIVE PROCESS [SJP Ex. #12] require managers to discuss the plaintiff's requests for accommodation with him. That didn't happen in Mr. Bingham's case - other than the managers' repeated assertion that the VA had no other jobs for the plaintiff to perform. Section 10. INTERIM WORKPLACE ADJUSTMENTS, reaffirms the VA's federally imposed duty to furnish an employee whose disability is obvious with interim workplace accommodations.

The VA Handbook §5975.1, at pp. 26-27, *#15. IDENTIFYING AND GRANTING ACCOMMODATIONS FOR EMPLOYEES [*SJP Ex. #13] at *subsection 10* mandates that the VA consider reassigning the requesting employee to another position as an accommodation when other accommodations are not available. No documents presented by the VA indicate that Accommodations Coordinator Jenkins considered the plaintiff for reassignment to a clerical job position within the VA. Instead, the VA waited until the plaintiff was about to be discharged before assigning him to the "interim" accommodation of cleaning hospital ice machines with an electric cart.

The Handbook §5975.1, pp.28-20, *16. REASSIGNMENT AS A REASONABLE ACCOMMODATION, subsection d.(1)* [SJP Ex. #14] imposes the duty to locate an accommodating job reassignment upon the VA's Human Resources Office – not upon the VA employee. *Subsection d.(3)* mandates the HR Office is to ascertain all the employee's skills, experience, and knowledge so that he/she can be assigned on a non-competitive basis to others positions within the VA. That did not happen. Instead, the HR staff sat on the plaintiff's second written request for accommodation for more than a month so EMS supervisors could designate

the plaintiff's disability-related absences as AWOLs and procure his discharge.

The plaintiff's case is one which can be analyzed under the Sixth Circuit's "direct evidence" analysis since the VA's two Accommodation Determinations confirm that the plaintiff was qualified, had a disability, needed accommodations, was actually entitled to his requested accommodations, and was finally-but tardily- afforded those accommodations. *Kleiber v. Honda of America Mfg., Inc., 385 F.3d 862. 869 (6th Cir. 2007)* and *Fisher v. Nissan N.Am., Inc., 951 F.3d 409 , 416-417 (6th Cir. 2020)*.

Having illegally refused to furnish the plaintiff with an interim accommodation when it should have AND could have and thus kept the plaintiff working at a sedentary VA job, the VA cannot use its attendance/call-in/AWOL policies as a "so-called neutral basis" to discharge him. *Roseman v. Linmoore, unpublished, 1:17-cv-826, S.D. Ohio, Aug. 17, 2021, at p. *5-6,* copy appended.

**Conclusion.** The defendant's motion for summary judgment should be denied.


Respectfully Submitted,


s/ C. R. DeVault, Jr.
CHARLTON R. DEVAULT, JR.
TN BPR #000428
102 Broad Street
Kingsport, TN 37660
(423) 246-3601

ATTORNEY FOR THE PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that on January 19, 2022, the foregoing PLAINTIFF'S SUMMARY JUDGMENT RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, with the plaintiff's Declaration and 15 summary judgment exhibits, was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

s/ C. R. DeVault, Jr.