UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| DEREK TODD BINGHAM, | ) | |
| | ) | |
| Plaintiff, | ) | 2:20-CV-00034-DCLC-CRW |
| | ) | |
| vs. | ) | |
| | ) | |
| DENIS R. MCDONOUGH, SECRETARY OF VETERANS AFFAIRS, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This employment discrimination action is brought by Plaintiff Derek Todd Bingham against Defendant Denis R. McDonough, the current Secretary of the Department of Veterans Affairs ("the VA"). His claims stem from his employment at the VA Mountain Home Medical Center ("VAMC") in Johnson City, Tennessee, where he worked as a housekeeping aid from March 2016 through January 2017. Plaintiff claims the VA discriminated against him on the basis of his disability, in violation of Section 501 of the Rehabilitation Act of 1973 ("the Rehabilitation Act" or "the Act"), 29 U.S.C. § 791, by failing to provide reasonable accommodations for his disability, classifying him as absent without leave ("AWOL") despite his various medical excuses, and ultimately discharging him for unacceptable attendance [Doc. 1, ¶ 32]. Before the Court is the VA's Motion for Summary Judgment [Doc. 22]. Plaintiff responded in opposition [Doc. 30] and the VA replied [Doc. 34]. This matter is now ripe for review. For the reasons stated herein, the VA's Motion for Summary Judgment [Doc. 22] is **DENIED**.

1

## I. BACKGROUND

Plaintiff has been a brittle diabetic since 2006, when he was diagnosed with Type 2 insulin dependent diabetes [Doc. 24, ¶ 8; Doc. 33, pg. 15].[1] As a brittle diabetic, Plaintiff's blood glucose levels are unpredictable and depend largely on the level of physical and mental stress he experiences throughout the day [Doc. 33, pg. 15]. Plaintiff also has a history of foot issues associated with his diabetes. In 2015, Plaintiff was treated for a diabetes-related bone infection in his foot [*Id.*]. After recovering, Plaintiff sought an entry-level position at VAMC [*Id.*]. On March 6, 2016, the VA hired Plaintiff for a two-year probationary period as a WG-2 Housekeeping Aid [Doc. 22-15]. Plaintiff initially worked in the hospital kitchen but transferred to a similar position in the Emergency Room ("ER") in August 2016 [Doc. 33, pg. 16]. While performing his housekeeping duties in both the kitchen and ER, Plaintiff was able to monitor and adjust his blood glucose levels as needed during his shift [*Id.*]. Plaintiff's six-month evaluation in September 2016 indicated he was "meeting expectations." [*Id.*].

In October 2016, Plaintiff applied and interviewed for a day shift housekeeping position in VAMC's surgical suites and adjoining laboratory areas [*Id.* at pg. 17]. The VA subsequently promoted Plaintiff to a WG-3 Housekeeping Aid, but Plaintiff's supervisor, Timothy Palmer, assigned him to a second shift bed-washing position while he waited for the day shift position to become available [Doc. 24, ¶ 26]. Plaintiff learned of the bed-washing assignment on November 1, 2016, when he arrived at work to find another employee in his ER housekeeping position [Doc. 33, pg. 17]. Plaintiff radioed Palmer to ask about the reassignment and referred to it as a "crock" [Doc. 24, ¶ 30]. Palmer informed Plaintiff the reassignment was at his discretion and part of

---

[1] Diabetes is considered "brittle" when "blood sugar levels are very difficult to control" and "glucose levels tend to swing fairly quickly high or low." *Fraser v. Goodale*, 342 F.3d 1032, 1035 (9th Cir. 2003).

2

Plaintiff's training for the day shift position [Doc. 33, pgs. 17–18]. Palmer later issued a Written Counseling Memorandum, informing Plaintiff that his statements regarding the bed-washing assignment were overheard throughout the hospital complex by coworkers and possibly patients and visitors, and that any future incidents of unacceptable behavior may lead to disciplinary action, including removal [Doc. 22-3].

On November 2, 2016, Palmer assigned second shift lead man Josh Reedy to train Plaintiff in the bed-washing position [Doc. 33, pg. 18]. Plaintiff discovered the bed-washing assignment required more walking than his prior positions and presumably more than the surgical suite position for which he interviewed [*Id*.]. Plaintiff had to walk at a fast pace to and from patient rooms all over the hospital to change bedding, wash down walls and ceilings, and sanitize beds and fixtures immediately after patients were discharged [*Id*. at pg. 19]. Plaintiff contends the bed-washing assignment became more intense during the hours he worked because most patients were discharged between 4:00 p.m. and midnight [*Id*.]. Due to the increased amount of walking and pace of the work, Plaintiff found he could not adequately check his blood glucose levels, medicate as needed, or have time to recover from high or low blood sugar levels [*Id*.].

Plaintiff asserts he told Palmer and Reedy on various occasions that he could not physically keep up with the pace of the work assignment, and the condition of his feet was deteriorating [*Id*. at pg. 20]. He further contends he told Palmer he needed time to monitor and medicate his blood glucose levels, took pictures of his deteriorating feet, and asked if he could return to the ER housekeeping position where it was easier for him to monitor his sugar levels and foot integrity or be transferred to train for the surgical suite position for which he applied [*Id*. at pgs. 20–21]. Palmer allegedly refused to look at the photos and told Plaintiff the ER position was no longer available, and he needed him on the second shift bed-washing assignment [*Id*.].

3

On November 4, 2016, Plaintiff submitted a written accommodation request for "flexibility in break schedule to be able to check and maintain healthy blood glucose levels" and "to be able to take breaks as necessary to check and maintain foot integrity due to complications of diabetes." [Doc. 31-3, pg. 1]. Plaintiff also submitted medical documentation from his primary care provider, Jim Montag, Jr. PA-C, requesting that he be allowed to check his blood sugar when warranted, administer his medication, wait for it to take effect, and check his feet periodically to prevent further damage [*Id*. at pg. 2]. VAMC's Human Resources Specialist Tammy Jenkins emailed Plaintiff on four different occasions from November 10 through November 22, 2016, informing him that the reasonable accommodation committee needed more information regarding the frequency of breaks necessary [Doc. 31-4]. Plaintiff submitted notes from Dr. Montag, who explained that Plaintiff needed to check his blood sugar as needed [Doc. 31-5, pg. 1]. Ms. Jenkins told Plaintiff the committee could not process his request without more specific instruction and "as needed" was insufficient [Doc. 31-4].

Dr. Montag ultimately faxed Ms. Jenkins a medical certification on December 6, 2016, stating that Plaintiff needed to check his blood sugar six times per day, needed to check his feet while checking his blood sugar, and suggesting he be allowed 5 to 10 minutes every 2 hours for relief of pressure off of his feet [Doc. 31-5, pg. 4]. However, by this time, Plaintiff had accrued multiple absences due to the condition of his feet. Shortly after Plaintiff started the bed-washing assignment, he used two days of sick leave due to blisters on his feet [Doc. 31-2]. By November 28, 2016, Plaintiff contends he was unable to walk for any distance and unable to work [Doc. 31, ¶ 51]. Plaintiff received a doctor's note from Dr. Montag's office on November 28, 2016, stating he could return to work on November 30, 2016 [Doc. 31-5]. On December 2, 2016, Plaintiff was seen and treated by Dr. Ryan Chatelain, a podiatrist in Johnson City, Tennessee [Doc. 31-5, pgs.

4

6–8]. Dr. Chatelain's notes indicate he encouraged Plaintiff to wear modified shoe gear, examine his feet daily, and control his blood sugar and blood pressure [*Id.* at pg. 7]. Dr. Chatelain also noted Plaintiff was "forming pre-ulcerative lesions" on his feet and "it would be hard for him to go back to work full duty given the amount of weightbearing necessary." [*Id.*].

On December 5, 2016, Plaintiff received another doctor's note from Dr. Montag's office, stating he could return to work on December 9, 2016 [Doc. 31-5, pg. 3]. When Plaintiff returned to work, he wore open-toed shoes and brought Dr. Chatelain's report [Doc. 24, ¶ 45; Doc. 33, pg. 24]. Because Palmer was in a meeting, Plaintiff reported to shift lead George White [*Id.* at pg. 25]. Plaintiff gave White Dr. Chatelain's report and asked what work he could do within his restrictions [*Id.*]. White indicated he was not aware of Plaintiff's restrictions but offered to assist Plaintiff in locating someone who could help [*Id.*]. As the two walked through the hospital, Plaintiff's feet began to hurt, so he asked White to leave the copy of Dr. Chatelain's report on Palmer's desk and proceeded to the ER [*Id.*].

PA Frank Testerman examined and x-rayed Plaintiff's feet at the ER and provided a Report of Employee's Emergency Treatment, noting that Plaintiff was seen for foot problems and recommending "seated work" and follow-up with Occupational Health [*Id.*; Doc. 31-6].[2] When Plaintiff returned to his department to give Palmer the ER report and remind him of Dr. Chatelain's report, Palmer allegedly looked at Plaintiff's shoes, laughed at him, and stated that the VA did not have any work for him to do in "flip flops" [Doc. 33, pg. 26]. Assuming there was no work for him, Plaintiff went home [*Id.*].

---

[2] On December 14, 2017, Plaintiff saw Angela E. Milligan, FNP with Occupational Health and Workers Compensation. Milligan reportedly told Plaintiff she could do nothing for him because work did not cause his diabetes [Doc. 31, ¶ 73].

5

On December 11, 2016, the reasonable accommodation committee approved Plaintiff's initial request, and based on Dr. Montag's orders, it allowed Plaintiff to take a five-to-ten-minute break every two hours while at work [Doc. 22-4]. When presented with this accommodation approval, Plaintiff felt it was inadequate because the condition of his feet had worsened, and that accommodation was based on the earlier preventative measures from Dr. Montag rather than the more recent recommendations of Dr. Chatelain for open-toed shoes, a lighter weight-bearing job, or a sedentary position [Doc. 22-1, pgs. 48–49]. When Plaintiff refused to sign the approval, Palmer allegedly stated, "Well, if you won't sign it, I will" and proceeded to sign on the line designated for Plaintiff's signature [*Id*. at pg. 50].

On December 13, 2016, White informed Palmer that Plaintiff called in and said he would not be coming into work that day [Doc. 22-9, pg. 3]. The next day, Plaintiff submitted a second written accommodation request for a "decreased weight bearing job requirement, with possible desk assignment with limited ambulation." [Doc. 31-7]. The following day, December 15, 2016, EMS Assistant Chief LuAnne Bays sent Plaintiff an Order to Return to Duty, explaining that he failed to report to work since November 28, 2016, and "[f]ailure to properly request leave and/or unauthorized absence (AWOL) may lead to disciplinary action up to and including removal from federal service." [Doc. 22-5]. In the Order, Assistant Chief Bays acknowledged Dr. Testerman's recommendation for sedentary work duties but stated that the documentation did not provide that Plaintiff would need to be absent from work [*Id*.].

That same day, Dr. Chatelain wrote a letter stating Plaintiff had been under his care and could return to work on December 16, 2016 [Doc. 31-5, pg. 9]. Dr. Chatelain's letter further stated:

> Patient needs to have cutout accommodations for pre-ulcerative lesions in supportive shoes at all times. It would be difficult for him to return to work full duty given the amount of weightbearing necessary. He is unfortunately forming pre-ulcerative lesions even with custom offloaded/accommodative inserts and

6

> appropriate shoe gear and states that these lesions form in under 2 hours of continued ambulatory activity when no accommodations are provided. Given the limited nature of his weightbearing status and concern for recurrent wound formation at current level of activity, consideration should be given to a more sedentary position, including a desk job that would allow him to work but limit the formation of wounds to his feet.

[*Id.*]. Plaintiff reportedly took this letter to VAMC, where he and shift leader Steve Hux engaged in a conference call with Palmer, during which Hux and Palmer both told Plaintiff the bed-washing job was the only one available, and they were at the "mercy of HR" and their "hands were tied." [Doc. 33, pg. 31]. On December 16, 2016, Plaintiff took copies of Dr. Chatelain's letter to human resources, Assistant Chief Bays, Hux, and Supervisor Chris Shelton [*Id.*]. Assistant Chief Bays told Plaintiff they did not have any work of that kind at the time [*Id.*].

The next week, Plaintiff did not report for work. On December 20, 2016, Plaintiff insists he called the EMS supervisors office twice and texted Supervisor Palmer's personal cell phone requesting information on jobs he could perform within his restrictions [*Id.* at pg. 32]. Palmer allegedly advised Plaintiff to apply for medical leave [*Id.*]. The next day, Plaintiff applied for leave and gave Palmer Dr. Chatelain's note that Plaintiff had been under his care and could return to work on December 26, 2016 [Doc. 22-9, pg. 11; Doc. 31-5, pg. 10]. On December 26, 2016, Plaintiff asked Ms. Jenkins about the status of his accommodation request, and she informed him the VA needed more details regarding how long he needed the accommodations [Doc. 33, pg. 33].

On December 27, 2016, EMS supervisors informed Plaintiff he had to come back to work or be designated as AWOL, and Plaintiff told them he had to have work which met his physician's restrictions [*Id.* at pg. 34]. The next day, Plaintiff submitted a doctor's note from Dr. Chatelain, requesting that he be excused from work through January 4, 2017, because he was "recovering from a health condition which incapacitates him from performing his current job duties" and that Dr. Chatelain would assess need for further time off or accommodations at that time [Doc. 31-5,

7

pg. 5]. On January 4, 2017, Facilities Management Service Chief Kevin Milliken submitted a memorandum to Employee Labor Relations and Human Resources requesting termination of Plaintiff [Doc. 31-9]. In support, Chief Milliken cited Plaintiff's absence from work since November 28, 2016, and the written counseling for the statements he made over the radio regarding the bed-washing assignment on November 10, 2016 [*Id.*].

That same day, Plaintiff submitted another doctor's note from Dr. Chatelain, stating he could return to work on January 9, 2017 [Doc. 31-5, pg. 11]. Ms. Jenkins confirmed receipt of the note but reiterated that she needed more information [Doc. 33, pg. 35]. Plaintiff proceeded to Dr. Chatelain's office to receive the information requested by Ms. Jenkins, but Dr. Chatelain's nurse, Nicki Peters, stated he was busy and had given the VA everything it needed [*Id.*]. Upon Plaintiff's request for more detailed information, Ms. Peters typed out the following:

> The prolonged standing required in the performs of his duties as a VA Housekeeping Aid/Bed Washer expedited the normal progression of Mr. Bingham's diabetic foot disease. On 1/4/2017 it was recommended this patient be placed in a sedentary, desk type position to prevent further aggravation of his foot disabilities.

[Doc. 31-5]. Plaintiff took Nurse Peters' note to the Human Resources Office and gave it to Ms. Jenkins' secretary [Doc. 33, pg. 35].

From January 10 through January 13, 2017, Plaintiff claims he called the EMS supervisor's call-in line on multiple occasions and left messages asking if there was any work he could perform, but no one returned his calls [*Id.* at pg. 36]. Ms. Jenkins emailed Plaintiff on January 11, 2017, informing him that unless his provider stated he was incapacitated and unable to work, he needed to report for duty and his department would temporarily accommodate him [Doc. 31-8]. Plaintiff explained that Assistant Chief Bays told him there was no work for him in the requested capacity and there had been no mention of interim accommodations conforming to his physician's

8

recommendations [*Id.*]. On January 13, 2017, Plaintiff spoke with Supervisor Palmer, who allegedly continued to insist that he work on the bed-washing assignment [Doc. 33, pg. 37].

On January 12, 2017, the reasonable accommodation committee approved Plaintiff's second written request [Doc. 22-6]. Specifically, the committee granted an accommodation of sedentary work for 3 months, at which time Plaintiff would be required to submit additional medical documentation from his providers if the restrictions needed to be extended or modified [*Id.*]. Ms. Jenkins notified Plaintiff of the accommodation approval on January 17, 2017 [Doc. 33, pg. 37]. At this point, Plaintiff had been absent from work since November 28, 2016. Because Plaintiff had exhausted his sick leave, the VA designated Plaintiff as AWOL for each of those absences, with the exception of the minimal annual leave Plaintiff accrued which the VA credited toward some of the absences [Doc. 22-11].

When Plaintiff returned to work, he stapled and stacked papers in Assistant Chief Bays' office [Doc. 24, ¶ 72]. The following day, the VA provided a motorized cart for him to use to drive around the medical center and wipe down the exteriors of ice machines [*Id.* at ¶ 73]. On January 20, 2017, the VA terminated Plaintiff "due to unacceptable attendance and conduct." [Doc. 22-7]. When presenting the termination memo, Chief Milliken informed Plaintiff that EMS supervisors stated he had not been at work at all for more than a month, had not contacted them, violated the Order to Return to Duty, and had been AWOL since November 28, 2016 [Doc. 33, pg. 39]. Plaintiff contends Chief Milliken did not mention his diabetes disability or the numerous medical excuses and requests for accommodations Plaintiff had submitted [*Id.*].

Following his termination, Plaintiff contacted the Equal Employment Opportunity ("EEO") counselor and Office of Resolution Management ("ORM") and filed formal EEO charges [Doc. 1, ¶ 33]. The VA issued a Final Agency Decision on November 26, 2019 [*Id.*]. On February

9

24, 2020, Plaintiff filed the instant action, seeking compensatory damages and attorney's fees for disability discrimination pursuant to Section 501 of the Rehabilitation Act, 29 U.S.C. § 791 [Doc. 1].³ The VA subsequently filed the Motion for Summary Judgment [Doc. 22] that is currently before the Court, arguing Plaintiff cannot prevail on his claim as a matter of law.

## II. LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "come forward with significant probative evidence showing that a genuine issue exists for trial." *McKinley v. Bowlen*, 8 F. App'x 488, 491 (6th Cir. 2001). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmoving party based on the record. *Id.* at 251-252.

---

³ Although Plaintiff testified in his deposition that he was subjected to a hostile work environment [Doc. 22-1, pg. 76] and briefly mentions a claim of hostile work environment in his Response to the VA's Motion for Summary Judgment [Doc. 30], he did not include a claim of hostile work environment in his Complaint and may not assert new claims in response to the VA's motion. *Hoffman v. O'Malley*, 447 F. Supp. 3d 629, 636 (N.D. Ohio 2020) (citing *Tucker v. Union Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) ("A plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.").

10

## III. DISCUSSION

"The Rehabilitation Act…constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007). Section 501 of the Act requires "[f]ederal agencies…to implement affirmative action plans to hire, place, and advance individuals with disabilities" and "creates a private right of action against covered entities for discrimination on the basis of disability." *Mahon v. Crowell*, 295 F.3d 585, 588 (6th Cir. 2002). Section 501 incorporates the standards applied under Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111, *et seq.*, for claims of disability discrimination. 29 U.S.C. § 791(f); 29 C.F.R. § 1614.203(b). Specifically, the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") provide:

> Federal agencies shall not discriminate on the basis of disability in regard to the hiring, advancement or discharge of employees, employee compensation, job training, or other terms, conditions, and privileges of employment. The standards used to determine whether Section 501 has been violated in a complaint alleging employment discrimination under this part shall be the standards applied under the ADA.

29 C.F.R. § 1614.203(b). Discrimination includes the failure to make reasonable accommodations to disabled employees. 42 U.S.C. § 12112(b)(5)(A).

"Employees can prove discrimination in two ways, either directly or indirectly, and each has its own test." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022). "Direct evidence explains itself" and "does not require the fact finder to draw any inferences to reach the conclusion that unlawful discrimination was at least a motivating factor." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013). In contrast, when a plaintiff relies on indirect evidence of discrimination, i.e., evidence that requires the fact finder to draw inferences, the familiar *McDonnell Douglas* burden-shifting test applies. *Id*. at 852–53.

11

Plaintiff asserts his case is properly analyzed under the direct-evidence test [Doc. 30, pg. 25], whereas the VA argues Plaintiff's claims are analyzed under the *McDonnell Douglas* burden-shifting framework [Doc. 23, pg. 9]. To be sure, Plaintiff alleges the VA failed to discuss and provide reasonable accommodations for his disability, discriminatorily classified him as AWOL for his disability-related absences, and subsequently terminated him because of those absences [Doc. 1, ¶ 32]. Under the ADA, the direct test is "always appropriate" for claims of failure to accommodate. *Cheatham v. Postmaster Gen. of United States*, No. 20-4091, 2022 WL 1073818, at *3 (6th Cir. Apr. 11, 2022) (citing *Fisher v. Nissan North America, Inc.*, 951 F.3d 409, 416–17 (6th Cir. 2020)). However, the Sixth Circuit has yet to apply this rule to claims under the Rehabilitation Act. *Id*. Because Plaintiff does not point to any direct evidence of discrimination, the Court will analyze Plaintiff's claims under the *McDonnell Douglas* burden-shifting framework.

A.   **Failure to Accommodate**

To establish a prima facie case of discrimination for failure to accommodate, Plaintiff must show (1) he is disabled; (2) he is qualified for the position; (3) the VA was aware of his disability; (4) an accommodation was needed; and (5) the VA failed to provide the necessary accommodation. *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997). The burden then shifts to the VA to "demonstrate that the employee cannot reasonable be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *Id*. at 1175–76. The VA does not dispute that Plaintiff is disabled, that it was aware of his disability, or that an accommodation was needed. Therefore, the Court's analysis focuses on whether Plaintiff was qualified for the position and whether the VA failed to provide the necessary accommodation.

An individual is "qualified" if he can perform the "essential functions" of his position "with or without a reasonable accommodation[.]" 42 U.S.C. § 12111(8). "Essential functions" are those

12

fundamental to the position. 29 C.F.R. § 1630.2(n). The VA argues Plaintiff's "chronic absenteeism" renders him unqualified because consistent onsite attendance is an essential function of the housekeeping position [Doc. 23, pg. 10].[4] In response, Plaintiff asserts he had to stop working on November 28, 2016, and continued to be absent until January 17, 2017, because the VA "refused to engage in the interactive accommodation process" and "denied an immediate interim accommodation which would have kept him working on a VA job which did not damage his feet." [Doc. 30, pg. 23].[5]

Excessive absenteeism may render an employee unqualified in certain circumstances. *Equal Emp. Opportunity Comm'n v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015); *see Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("An employee who cannot meet the attendance requirements of the job…cannot be considered a 'qualified' individual."). However, "this logic does not apply if the absenteeism is caused by an underlying failure to accommodate a disability." *Fisher*, 951 F.3d at 418. "[A]bsenteeism that can be cured with a reasonable accommodation is treated differently." *Id*. The Sixth Circuit illustrated this principle with the following analogy:

---

[4] The VA also argues Plaintiff must explain the inconsistency between his claim that he was otherwise qualified and the representation in his application for Social Security benefits that he became disabled on November 28, 2016 [Doc. 23, pg. 11]. However, as the Supreme Court has explained, the definition of a "qualified individual" under the ADA and Rehabilitation Act takes into account whether the individual can perform the essential functions of the job with reasonable accommodation, whereas the SSA "does *not* take the possibility of 'reasonable accommodation' into account[.]" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 803 (1999). Thus, as is the case here, a claim in a disability discrimination action "that the plaintiff can perform [his] job *with* reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform [his] own job (or other jobs) *without it*." *Id*.

[5] The VA has not presented an argument for summary judgment on Plaintiff's claim for failure to engage in the interactive process, which is an independent violation if Plaintiff proposed reasonable accommodations. *Rorrer v. City of Stow*, 743 F.3d 1025, 1045 (6th Cir. 2014).

13

> Imagine…a school that lacked an elevator to accommodate a teacher with mobility problems. It could not refuse to assign him to classrooms on the first floor, then turn around and fire him for being late to class after he took too long to climb the stairs between periods. In other words, even though presence in the classroom when the bell rings is an attendance requirement, a tardy teacher is not unqualified if his tardiness results from his employer's unwillingness to accommodate. If, by contrast, no reasonable accommodation would cure the attendance problem—as, for example, when an employee is not medically cleared to work at all or blames his absences on car problems rather than disability—the employee is not qualified.

*Id*. (internal citations and quotations omitted). Plaintiff alleges his absences were because of his disability and the inability to work outside of his provider's restrictions. Thus, his "absences do not in and of themselves render him unqualified for his position." *Id*. Rather, the Court must "ask whether those absences could have been avoided with reasonable accommodation[.]" *Id*.

The VA focuses on the two accommodations it provided. It is undisputed that the VA approved both of Plaintiff's accommodation requests, but Plaintiff argues these accommodations came too late. A reasonable fact finder could agree. First, the VA approved Plaintiff's request for frequent breaks weeks after his condition had deteriorated to the degree the breaks were intended to prevent. A month later, the VA approved Plaintiff's request for a sedentary position after repeatedly telling him there was no work of that kind available and simultaneously ordering him to come to work. Despite Plaintiff's immediate return to work once the sedentary position was provided, the VA terminated him three days later for the absences he accrued while waiting on the accommodation. It is the period of time between the requests and respective approvals that Plaintiff asserts the VA failed to provide necessary reasonable accommodations—that is, interim accommodations—that would have allegedly prevented his chronic absences.

The VA contends it was not required to provide immediate accommodations. Nonetheless, the EEOC regulations defining the duties of federal agencies under Section 501 provide:

> [W]hen all the facts and circumstances known to the agency make it reasonably likely that an individual will be entitled to a reasonable accommodation, but the

14

Case 2:20-cv-00034-DCLC-CRW   Document 43   Filed 06/03/22   Page 14 of 17   PageID #: 526

accommodation cannot be provided immediately, the agency *shall* provide an interim accommodation that allows the individual to perform some or all of the essential functions of his or her job, if it is possible to do so without imposing undue hardship on the agency[.]

29 C.F.R. § 1614.203(d)(3)(i)(Q) (emphasis added). In justifying the inclusion of the mandatory "shall" language, the EEOC explained that "[i]nterim accommodations may be necessary in order to avoid…a worsening of symptoms, exacerbation of a medical condition, or pain[,]" and, as a result, they "may play a crucial role in preserving the requesting individual's ability to work." 82 Fed. Reg. 654, 662–63 (January 3, 2017). For those reasons, the EEOC has held that an agency's "failure to provide…an interim accommodation constitutes an independent basis of liability." *Nicki v. Burrows*, EEOC Appeal No. 0720180023, 2021 WL 4477010, at *11 (Sept. 18, 2021).

Shortly after Plaintiff started the bed-washing assignment, he informed Reedy that "his diabetic condition would not tolerate the significant increase in walking" [Doc. 33, pg. 19]. Following his written request for frequent breaks, Plaintiff allegedly told Reedy and Palmer he physically could not keep up the work pace of the assignment and his feet were deteriorating [*Id.* at pg. 20]. In the medical certification submitted with Plaintiff's written request, Dr. Montag explained that low or high blood sugar levels could affect Plaintiff's mental status and cause loss of consciousness, seizures, or cardiac arrest [Doc. 31-3, pg. 3]. Dr. Montag further indicated Plaintiff needed the requested accommodation to prevent all of the foregoing and the worsening of wounds on his feet [*Id.*]. In light of the information provided to the VA, it is apparent an interim accommodation was necessary to avoid exacerbation of Plaintiff's diabetic foot condition. After his condition deteriorated, it was even more apparent that Plaintiff needed accommodations to allow him to work. Specifically, Plaintiff provided medical documentation on more than one occasion explaining his need for open-toed shoes and a sedentary position to prevent further aggravation of his condition.

Thus, the facts and circumstances known to the VA made it reasonably likely that Plaintiff would be entitled to a reasonable accommodation—initially, frequent breaks, and then modified shoe gear and reassignment to a sedentary position. Because these accommodations could not be provided immediately, the VA had an affirmative obligation to provide an interim accommodation that allowed Plaintiff to do his job, so long as it was possible to do so without imposing an undue hardship. 29 C.F.R. § 1614.203(d)(3)(i)(Q). The VA does not offer any reason why providing an interim accommodation would have imposed an undue hardship.[6]

Based on the foregoing, the VA was obligated and failed to provide an interim accommodation during the pendency of Plaintiff's accommodation requests. Moreover, a reasonable jury could conclude, based on the facts, that Plaintiff's absences could have been prevented had the VA provided an interim accommodation. Thus, Plaintiff's absences do not render him unqualified, and his claim for failure to accommodate survives summary judgment.

### B. Discriminatory Discharge

To establish a prima facie case of discriminatory discharge under the Rehabilitation Act, Plaintiff must show: (1) he is disabled; (2) he is otherwise qualified; and (3) he was discharged solely by reason of his disability. *Jones*, 488 F.3d at 403.[7] For the reasons discussed previously,

---

[6] The VA does argue that reassignment to a sedentary position is neither viable nor reasonable. Nonetheless, this is refuted by the undisputed fact that the VA ultimately provided Plaintiff with a sedentary housekeeping position cleaning ice machines. Thus, reassignment to a sedentary position for which Plaintiff was qualified was viable and a fact finder could conclude it was reasonable as well.

[7] The Sixth Circuit has expressly distinguished between the causation standards under Title I of the ADA, 42 U.S.C. § 12112(a), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315 (6th Cir. 2012) (holding Section 504 prohibits discrimination "solely by reason of" an individual's disability, while Title I prohibits discrimination "because of" an individual's disability.). However, the Sixth Circuit has yet to establish which standard applies to Section 501 claims. Nonetheless, the issue is not necessary to the resolution of this motion, because Plaintiff's claim survives under either standard.

Plaintiff satisfies the first two elements—he is disabled and has presented sufficient evidence that he is otherwise qualified. As to the final element, the VA concedes it discharged Plaintiff because of the absences he accrued from November 28, 2016 to January 17, 2017, but argues such excessive absenteeism was a legitimate, non-discriminatory reason to terminate Plaintiff [Doc. 23, pg. 11].

However, the VA's discharge must be considered alongside the alleged failure to provide a reasonable accommodation. This is because "failure to consider the possibility of reasonable accommodation for known disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities." *Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018). Because, as discussed above, a reasonable jury could conclude Plaintiff's absences could have been prevented had the VA provided interim accommodations, it necessarily follows that the same jury could find that the VA discriminated against Plaintiff on the basis of his disability by terminating him due to those absences. Therefore, summary judgment is also inappropriate on Plaintiff's claim of discriminatory discharge.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, the VA's Motion for Summary Judgment [Doc. 22] is **DENIED**.

SO ORDERED:

s/ Clifton L. Corker<br>
United States District Judge